My name is Daniel Cohn and I represent the appellant who are 27 individuals sick or dying of asbestos disease whom we refer to as the Montana plaintiffs. How do you understand how the claims are divorced from, independent of the insurance relationship that they don't quote, arise under the insurance contract? Sure, Your Honor. May I first request that the panel grant me five minutes of your time? Sure. Thank you. Your Honor, the reason that these claims are independent of insurance is because they do not depend in any way upon the terms of the insurance contract. Under Montana law... So what about the obligation of the insurer? Doesn't that arise from the fact that there is an insurance contract in place? Well... And in that, would there be any obligation for failure to warn, failure to inspect, any of that stuff? Well, Your Honor, the answer is yes, there would. I think what you are, in effect, referring to is that, but for CNA's position as the workers' cop insurer, they might not have been on site, might not have performed these inspections and so on. But the conduct that CNA engaged in does not arise under the insurance contract. In fact, the insurance contract says that if CNA comes on the site and inspects and takes measures to assure worker health or safety, then CNA has no liability for such conduct. Well, why would they have a right to come on to do that? What gives them the legal right to come on and inspect for safety and make suggestions about safety and make specific recommendations that are binding if they don't do that? What gives them that right? Oh, clearly, Your Honor, the insurance contract. Okay, then why doesn't it arise under then? Why don't the claims arise out of the insurance relationship? Well, I'm sorry, Your Honor, the insurance relationship and the insurance contract are two separate things. Montana law has a comprehensive system of regulation of workers' compensation insurance and insurance carriers. For lost wages? Well, there are benefits to be paid for lost wages, Your Honor, but there are obligations of good faith. Okay, I'm trying to separate the workman's comp from the other claims here. That's a separate claim. Yes, Your Honor, that's fair. Okay, so if we now look at the channeling injunction and the language of what gets channeled into the Personal Injury Trust, that's what I'm trying to focus on. Yes, Your Honor. Why isn't the insurance, the claims in Montana such that they come out of the relationship between CNA and the debtors? Coming out of the relationship, Your Honor, is not the statutory standard. The statutory standard is by reason of the provision of insurance. And as the Second Circuit has interpreted ... Maybe it's the same thing. Well, the Second Circuit has interpreted the specific language of by reason of the provision of insurance, or by reason of any of those four statutory relationships that are specified in the statute, to require that the provision of insurance be a legal element of the claim. And our contention is that under Montana law, it is not a legal element of the claim, and therefore we should be allowed to proceed. But that's different. When you're talking about an element of the claim, you're talking about what goes into making it part of a facial case. That's pretty different. I'm looking at the language of the channeling injunction, and it talks about what is in the asbestos personal injury claim. It says it is a claim to man, etc., against any of the debtors, or the asbestos protected parties, and I think there's no dispute there, arising out of the presence or exposure at any time to asbestos on behalf of the debtors. And I'm trying to find out why that language seems to be broad enough. Your Honor, all of the language, all of the language, every last word that is contained in the grace plan, is subject to the supervening provision that it is limited by Section 524G4. That's what the plan itself says. So therefore, our inquiry is entirely based upon the statute, and it is not based upon the terms of the injunction, except to the extent that the limits of the statute, which is, of course, that other argument that we were talking about a moment ago. But it talks about allowing an injunction, such that an injunction may bar any action directed against a third party, and I think we agree that we're talking about a third party here. Maybe we don't agree about that. I apologize, Your Honor. Can you just say... Okay, I'm looking at 524E. Yes. And it talks about notwithstanding any provision of, I'm sorry, the code is talking about notwithstanding any provision of 524E, an injunction may bar an action directed against a third party, and I'm seeing it as a third party here. Yes, Your Honor. Okay. Who is identifiable from the terms of such an injunction and is alleged to be directly or indirectly liable for the conduct or claims against the debtors. Yes. And what I'm wrestling with, why isn't the quote that makes you directly liable for the claims against the debtor the contract of insurance? Well, those terms have a meaning in the insurance context, Your Honor. The direct liability of an insurer is under some states there are provisions whereby a claimant can directly sue the insurer under the insurance policy to collect for the conduct of or claims against the insured, in this case the debtor. In addition, Your Honor, an indirect liability would be where the normal policy liability which ordinarily runs simply from the insured, I'm sorry, from the insurer to the insured and doesn't involve directly the claimant itself. So if a claimant is trying to get at the insurance policy indirectly, then that too would be barred by the terms of Section 524G4. What about getting at the insurance policy but getting at the funds of the bankrupt estate? Would that be barred? Yes, Your Honor. It would be barred. Well, I don't know of another way to get at the funds of the bankruptcy estate through an insurance company other than, but I mean, I guess perhaps I don't understand the question. Okay. I would have said yes if you understood the question. What I was getting at was whether or not the chain injunction bars those things which get at the bankruptcy estate. If the claim would have to be paid out of the proceeds of the bankrupt estate, would that be barred by the injunction? Well, the, okay, so there are two ways in which an insurer could, you know, get at the assets of the bankruptcy estate. One way is by a contribution or an identity claim, and I'm now talking about a claim by the insurer for its own wrongdoing, the type of claim that we're asserting here. So yes, it is true that if we recover from CNA, then CNA will presumably turn around and assert a claim against the asbestos trust. That, however, is not an instance of getting at the assets of the estate because the insurer simply steps into the shoes of the claimant, gets no more money. In fact, the asbestos personal injury trust document says that the CNA can get no more money than the claimant himself could have gotten. So that has no effect on the assets of the estate. The other way on the facts of this case is that there was a settlement agreement between CNA and Grace, and under the terms of that settlement agreement, there is a limited identification which the trust, as successor to Grace, undertook for certain kinds of claims. And I would note, Your Honor, that technically the identification is for asbestos personal injury claims, and that is defined to exclude some of the types of claims that we're talking about right here. But putting that aside, Your Honor, the real difficulty of trying to put in this jurisdiction and trying to say that the injunction extends to those claims is the fact that this was a post-petition agreement which was structured to provide for this kind of financial support of the debtor conditioned upon or part of the settlement agreement was conditioned upon this identification right. And that places it squarely within combustion engineering. Where this Court said you can't create jurisdiction by agreeing to fund a plan. You can't create the right to an injunction that you otherwise wouldn't have by reason of this self-created obligation. What's the purpose of 524G? That's an excellent question, Your Honor. The purpose of it is to permit bankruptcy estates in asbestos cases to maximize their recoveries on insurance policy assets, assets of the estate, by providing a very complete form of protection to insurers from asbestos insurance policy liability. The estate has no interest in protecting an insurer from claims that the debtor does not own, that don't lay claim to assets of the estate. So this particular policy, which is liability and workers' comp, was it listed on Exhibit 5? Was it not to the plan? It was not, Your Honor. It was not? CNA was, right? Other certain policies of CNA were listed, but CNA has acknowledged in its brief that the workers' compensation policies were not. Is this a combination policy? What's excluded, I think, as I recall, is if something is exclusively solely workers' comp, right? Well, Your Honor, there are two branches of the argument. And, yes, there is a clause that excludes rights or obligations pertaining solely to workers' compensation coverage. But there's a separate argument, Your Honor, that just as a matter of construing the plan and the grace settlement agreement, the policies simply do not appear in Exhibit 5. And the reason they don't appear in Exhibit 5 is they're not listed by policy number and they're not picked up by the—there's a kind of catch-all. But what you need, then, under your theory, is something under Montana law that says that there is an obligation of CNA to third parties to give them warning, among other things. Isn't that correct? In other words, you have to have a separate cause of action under Montana law, do you not? I'm sorry, Your Honor, first of all— We sent out two requests for what does Montana law require or allow. Is there anything under Montana law that suggests that you have an obligation of an insurer, for example, to a third party, that is, somebody other than the insured, to do certain types of duties? We've identified two branches of claims under Montana law, and one of them is exactly what you just described, namely the obligation of insured workers' compensation. Which case does that? Under the statute. I'm sorry, up there, I think we're just relying on the statute and the cases that say that in regard to its statutory duties, that a workers' compensation insurer has a duty directly to the claimant, as distinct from its relationship with the insurer. Is there any Montana law or case that imposes on a contracting party a duty to warn or prevent harm to a third party? Yes, Your Honor. Which one? The Peterloo decision, which we cited in our second letter brief. What does it say? What it says is that that was a case of a business invitee on property, and it said that if you invite somebody onto the property and you foreseeable that they will be harmed by a failure to warn, then even though it isn't even your property and even though you didn't create the hazard, you have a duty to warn. How does that apply to this case? It applies to this case because Maryland, I'm sorry, CNA undertook duties that made it reasonably foreseeable that... That's a stretch, though, because you don't have the relationship there that you had in the case that you were lying about. The relationship of an invitee to someone that owns a property is really different. I'm not sure how you are going to explain it. So if you were CNA or, for that matter, some independent contractor who comes onto the site to do industrial hygiene, to do dust control, to look at the asbestos hazard, to inspect the premises... Who did they invite to the property? Who did they invite to the property? They did not invite...  Well, certainly not our client, Your Honor. In fact, some of the plaintiffs were not even employees. Isn't that right? That's definitely correct, Your Honor. How many of the 27 are employees? How many of the 27 plaintiffs are employees? Two of them are employees, Your Honor. And then in addition, there are spouses and family members of people who came home covered with asbestos dust because of CNA's failure to warn. And, you know, the worker would come home and hug his children and his children are now dying of asbestos disease. That's what we're dealing with here. So the question is, yes, we're Montana law. Is there a cause of action under Montana law? Now, one thing I need to emphasize here, Your Honor, is we have included a bunch of Montana... Go ahead. Finish it. No, go ahead. Sure. We've included in our letter briefs and in our main briefs the Montana law that backs up our alleged claims. But I want to emphasize that the word alleged in the statute has a very important meaning here. As the Second Circuit noted in Mandeville, it is not for a federal court to determine whether there are state law claims. It is simply for the federal court to look at the state law claims that are alleged to exist. And if they pass through the gate, then they have to be allowed to proceed in state court and let the Montana courts tell us whether we do or do not have a claim based upon what we plead. If the purpose is to protect insurers for the conduct of the debtor, in this case, Grace, and you're saying that 27 plaintiffs were injured either as a result of working or indirect exposure from people who did work at the Libby, Montana facility, that sounds like you're talking about the liability, ultimately, of Grace, right? I mean, the first party liable is Grace. Well, Grace is a party that's liable, but you find that in the tort context everywhere. So if you are the insurer of Grace, then there needs to be something else that shows a duty of that insurer to the third parties. And you're saying that duty is, what, the duty to inspect? Well, no, under Montana law, if you inspect, then you create the expectation, and you do it under circumstances where there is a reasonable expectation of reliance by other parties, that you do undertake a duty to those parties. And it is certainly the case, Your Honor, that if there are workers at a plant, and you go in there and you conduct an inspection for the purpose of determining the asbestos hazard, and you fail to disclose it, under Montana law, you have undertaken a duty to those people, which you then breach. But I guess the question is, how does that injury not derive from the liability of Grace for the asbestos? It does not derive from the liability of Grace for asbestos because what Section 524G4 does is it limits claims against third parties that are adjoined to those that seek to hold the third party liable for the conduct of or claims against the debtor. We're not seeking to hold CNA liable for conduct of or claims against the debtor. The opposite of conduct of or claims against the debtor is conduct of or claims against the third party. And in this case, it's the third party's conduct that is the basis for liability, and solely that. Your Honor, CNA in this matter is among the small minority of insurers who appear in Chapter 11 cases who have committed their own independent wrongdoing. The vast majority of insurers know such claims exist, and those insurers, and for that matter CNA, will come into the bankruptcy court, they'll settle their policy-related liability, and that's what the statutory scheme is designed to assure, and that's how the bankruptcy court is going to find them. And your concept of wrongdoing is what you just described, going in, either not inspecting properly, or inspecting but not taking the steps they should have taken pursuant to what they saw in the inspection to guard the people who encountered that dustman injury? Yes, Your Honor. Yes, Your Honor. And such claims, by the way, you know, Montana is, shall we call it a jurisdiction that has lots of cases of first impression. You know, it's a rural state, there aren't that many cases, and the law is not as well-developed as it necessarily is in other jurisdictions. But the Montana courts have taken an expansive view of the duties that you undertake when it's foreseeable that other people will rely upon you. A recent example was the Orr case, where they said that the state of Montana, by reason of its own inspections of the Grace facility, had undertaken its own independent obligation, which created an independent duty and a basis for liability to those who were injured by the failure to disclose the asbestos hazard. And that duty, that inspection, that conduct, did not, was not to be, was not by reason of, did not arise by reason of the third party's provision of insurance. Well, not in the CNAs. Because as the second circumstance... I'm asking you who did CNAs. I'm sorry? I'm asking you who CNAs did. I'm trying to figure that out. I'm saying, no, CNAs, CNAs' misconduct did not arise by reason of the provision of insurance. And the reason is, because as the second circumstance states, what by reason of means is that provision of insurance would have to be a legal element of our claims against CNA. If we can state claims under Montana law, of which the insurance policy is not a legal element, then those claims do not arise by reason of the provision of insurance,  You're talking about John's Mandeville, right? Yes. That predated 524G, did it not? It did, Your Honor. However, Section 524G was designed to implement, essentially, in a statutory sense, what Mandeville had done by injunction. When Mandeville and the second circumstance reason to apply, the recovery would be from the proceeds of the insurance policy. That's what I was asking you before when I asked you about whether the insurance estate would be able to look for this, the bankruptcy estate, not the insurance estate. Yes. Right. In Mandeville and also in this case, the insurance policy assets were not implicated in the claims that were being brought by the plaintiffs. And the plaintiffs were allowed to proceed in Mandeville and to be allowed to proceed here precisely because they are not seeking to recover from insurance policies. You saved, I think, five minutes on rebuttal. Let me just ask one more question here. How many times did CNA go on to the property here in Libby, Montana, in order to inspect machinery, equipment, operations, et cetera? No, Your Honor. We haven't yet had a chance to do discovery. Now, the policy says they are permitted but not obligated to do so. So you don't know if they did or didn't. Do you think they did but you don't know how many times or you don't know? We have indications that they did it, but we don't know how often. We don't know the details, Your Honor. And the policy says in addition to their being permitted but not obligated to inspect at any reasonable time what places, operations, machinery, equipment, neither the right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the insured or others. Exactly. Exactly, Your Honor. In other words, we are not stating a contractual cause of action. We have none. The contract expressly disclaims liability. The only claims we have are claims that arise under Montana common law and under the workers' compensation statute. That's why you're saying it doesn't arise under the policy of insurance. That's why you're making that point. Yes, Your Honor. We expressly disclaim any ability to sue under the terms of that policy. So then you, back to the reason for the request we made of you, you're saying that in this type of situation Montana law requires, puts a duty on an insurer to inspect premises among other things? No. What's the duty? No. One by the other, what the duty is? No, no. It's if you go and you do it and you discover an asbestos hazard, then if there's a reasonable expectation that there will be foreseeable harm to somebody else if you don't disclose it, you have a duty to disclose and liability for failing to disclose. But you don't know if they went on the property. You don't know if they did go on the property, if they found anything that was harmful or not. Is that correct? What do you know based on, currently? What we believe we know is that they did conduct inspections. We don't know to what degree. We don't know how often, but there are indications. There are documents that we have received through Grace that would appear to indicate that. Okay. Thank you. Thank you. Thank you. May it please the Court, Michael Giannato for the appellee's CNA. I'd like to start, if I may, by focusing on some of the issues that came up during Mr. Cohn's argument. Let me just ask some factual questions, picking up where we left off with Mr. Cohn. Did CNA ever actually inspect Grace's facilities? Your Honor, I believe they did. But the basis of this summary judgment motion is based on the complaint. I got it. Yes. Roughly how many times? I don't know, Your Honor, because we moved for summary judgment. They didn't seek discovery. But I know that there were inspections, yes. So if they did inspections, and assuming that they found something, and I'm not going to ask you if they did or didn't, but if they did find something, wouldn't they have an obligation to warn Grace, at the least, that there's a problem? I think that if they did any inspections, it would have been with Grace's permission, and Grace controlled everything at that mine. There was a big criminal charge. Let's say they found something. Pardon? Let's say they found something, some problems. They would have revealed it to Grace. That's correct. And would they also, under Montana law, have an obligation to reveal that to the employees of Grace? I don't believe so, Your Honor. Because? Because they were in privity of contract with Grace. It was part of their insurance services to Grace, part of the provision of insurance, and they would have reported it to Grace. Is there anything under Montana law that says in that type of situation there is no obligation owed to a third-party employee or that party's relatives for harm done to them from asbestos? Your Honor, Section 324A of the restatement, which the plaintiffs claim they're going to base their claims on, provides that if one provides services for another, there can be a basis of liability in three situations. One is if you make the situation worse, which there's no allegations that we did here. The second is if you specifically undertake the employer's duty here to warn people, which we didn't. Our contract specifically said, in the language you pointed out, that we didn't have that duty. And third is that if people relied on us to do this, and there's no allegations here in the complaints that anyone relied on us, and it's hard to believe that general members of the Libby community would have relied on an employer's liability insurer to inspect the plant. So we believe that if these claims are allowed to go forward, if the injunction, the channeling injunction, does not bar them, that we will have a motion to dismiss under Montana law. But part of the purpose of the channeling injunction is not to make us go to the expense of doing that, not to subject us to the vagaries of state law, but to allow us to be protected. This arises directly under the provision of insurance. The statute does not say arising under the insurance contract. It doesn't say arising because you have to pay policy proceeds. It says arising out of the provision of insurance. It doesn't even say by reason of insurance. It says arising. And when insurance companies undertake inspections and loss control services, as we showed in our brief and cited to things, that that is the core function of what an insurance company does. That is the provision of insurance. We have to figure out the premiums. We have to figure out what things the insurer can do to lower its losses and lower claims against the insurer to lower premiums. That's what we do. And that's what we did here. And it is legally relevant under Quigley. Quigley was a situation where Pfizer, which is in the drug manufacturing business, acquired a subsidiary. And then Pfizer went out and put its name and logo on the subsidiary's product. In effect, it held itself out to the public as manufacturing or selling or behind this asbestos product. In our case, we always act as an insurer. At least that's the allegations they've made. We never left that insurer-insured relationship. And this arose by reason of the provision of insurance. And yes, it is true, as they've pointed out, that a non-insurer could have come in here and contracted with Grace to do that. That's correct. But a non-insurer could have also contracted with Grace to indemnify for its asbestos liabilities. That doesn't mean that we're not protected for policy proceeds because we issued an insurance policy. What kind of claim? How do you see the Maryland plaintiffs different, the Maryland casualty folks, as opposed to CNA? The Maryland plaintiffs were two employees, former employees. And they were making two kinds of claims.  They were former employees of Grace. And that's not a claim made against us. The reason that the Maryland casualty case came out differently was that their workers' comp and employers' liability policies were not identified on Exhibit 5 of the plan. Exhibit 5 only identified their CGL and their excess policies. In our case, we identified all the policies listed in our settlement agreement of subject policies, which included all known and unknown policies in the relevant time period that potentially provide coverage for asbestos claims. And these did because of the employers' liability. Now, the workers' comp parts of them, the part that deals solely with workers' comp, they're not protected. If someone wants to make a workers' comp claim, they can. But there's no preemption of workers' comp at all. But any portion of our policy that didn't deal solely with workers' comp is protected. And that's part of it. Any inspections we did would have been part of the whole policy, not just part of the workers' comp policy part. Now, in the Hunt case, which is the Maryland casualty case, they had not listed those policies. And the bankruptcy court allowed Libby to go up. Its ruling was they could go forward with claims of employees who wanted to assert that they should have been warned or that Maryland casualty didn't properly process their claims for workers' compensation. And no one appealed that decision. What kinds of claims against third-party insurers like CNA can be brought under a channeling injunction because they are non-derivative? So what would be non-derivative? If CNA went into the business of selling Grace Insurance, that would be non-derivative. Well, it would be by reason of the insurance contract. So, again, I don't understand that. If they went into the business of selling Grace Insurance, correct. But, okay, let's take Mr. Cone's theory. Forget the insurance policy. They go on to the property. They do an inspection. They find a problem. They don't tell anyone. If there is, under Montana law, and forgetting for the moment your motion to dismiss if this case gets back to Montana law, if under Montana law there is some type of duty to warn, why is that not non-derivative? The reason it's non-derivative is this. Yes, under your scenario, we did some act. We really failed to do some act. We failed to warn. But the concept of indirect liability, you know, indirectly liable for Grace's claims, and the concept of doing something are not mutually exclusive. You can do something. They'd still be arguing we did it. And as a result, we're indirectly liable for the injuries that Grace caused. It goes back to 524G1 and 2. Grace is protected from any claims or demands against it that seeks to recover for personal injuries or wrongful death caused by asbestos. And these types of claims are based on those types of injuries, and they're seeking to hold us indirectly liable because of our conduct. And it's like the MGM case we cited for indirect liability for copyright infringement. Just because somebody does something wrong doesn't mean it can't be indirect liability. In the copyright infringement case, you're held indirectly liable if you contribute to a direct infringement. But you've done something wrong. And the second part of it is all the other categories listed in 524G4, the parent, the officer and directors, they've got to do something. They're not just liable because of their status. They're doing something. If you look at Judge Fitzgerald's opinion in Pittsburgh Court, they were being held jointly and separately liable to the parents for providing services, for conspiracy. So they have to take some act to be liable. Just like here, yes, if we were on the property, we'd take some act. But it still means that they're seeking to hold us indirectly liable for Grace's conduct, for its injuries. And that's really why Mainville is different. In Mainville, Travelers was overreaching. Travelers wasn't seeking to be exempt from liability just for people who were injured by Mainville products. Travelers had been sued by people claiming they were injured by dozens and hundreds of different products. And they were trying to leverage their relationship with Mainville to say, oh, we should be entirely exempt. And they paid $500 million for the bankruptcy judge to, in effect, say the injunction always protected you. But here, it is all injuries caused by Grace's conduct. And again, it goes back to 524G1 and 2. That's what the injunction is supposed to protect. And that's what they're suing for here. But what about Counsel's theory that failure to warn is an act? By not doing something, you're, in fact, doing something. You can look at it either way, whether it's doing something or not doing something. If they're claiming that what we did or didn't do makes us indirectly liable for the injuries caused by Grace's conduct. Remember, we can be liable not just for the claims and demands against Grace, but also for indirectly liable for its conduct. And it was Grace's conduct that injured these people. And before the bankruptcy, nobody sued CNA. These people weren't suing CNA. And they're only suing us now because they can't hold Grace liable. They can go to the trust. And they can collect fairly generously from the trust. Actually, the future claimants representative who represented these people in the bankruptcy made sure that these legal claimants, they can get up to eight times what someone else gets. There's a special disease that was put into the categories there just for these legal claimants. And the future claimants representatives were well aware of these types of claims that the Montana plaintiffs are now making. And, in fact, part of our settlement, which was conditioned on the approval of the future claims representative, representative of these people, was part of it was that they had to approve the settlement. And so the types of claims they're making are not just claims that can be made by living Montana people. These were national workers' compensation policies. Under their theory, anyone living anywhere near any Grace plant could try to make this kind of claim. And so the future claimants representative made sure that he settled and got money for it. If you have the following example, CNA is allowed to, doesn't have to, go onto the property of Grace and Libby. It does do it. It finds problems. It alerts Grace. It does a report. And there are discussions between Grace representatives and CNA representatives that essentially say we're not going to, we're just going to keep this under wraps. We're not going to do anything about it. And reluctantly CNA goes along. And ultimately Grace goes bankrupt. And you have, you are where we are today. Is that a derivative claim in that context against CNA or a non-derivative claim? It's a derivative claim because the plaintiff's injuries are caused by Grace's conduct in exposing them to asbestos. But if there's a separate obligation under Montana law, and I emphasize if, there's a separate obligation under Montana law to disclose, at least to the employees, what you find when you go onto the property of Grace and discover problems. Asbestos problems. If you're talking about a common law duty of care, I'd say the claim is still derivative. Because? Because Grace is the ultimate party responsible for the injuries. I think everybody agrees that Grace is the source of the problem. If you're claiming we've breached this duty, you're seeking to hold us indirectly liable for Grace's conduct. He can only add to our crime. I think what was posed, though, gets around that point. That's why I think he posed the hypothetical of the care that he did, to take that out of the equation. So that it's just the conduct of CNA in collusion, if you will. I don't know how the word's used these days. But in conversation with Grace, where CNA takes it upon themselves to go along with the suggestion that they're not telling anybody. I would say that would be derivative. Okay. First of all, it couldn't happen, because something like that wouldn't happen. But secondly, it's derivative because it goes back to 524G1 and 2. It derives from injuries from Grace's asbestos. And we've settled these claims, in effect. In that example, doesn't the liability that's alleged derive from the purported obligation under Montana law to disclose possible harms? It does, but it's based... Even if Grace is the source of them, which of course it is. But the basis of that obligation under Montana law would derive from our provision of insurance. That's the only reason we would have any kind of common law obligation. Just like a parent is only liable when... But under the insurance policy, you say we don't have... We can go on. We don't have to. We can go on the property. No obligation of our doing so. And we don't have any liability to you, the insured, nor to any third party. But you do go on. And once you do it, and you discover significant problems... And under my example, you then discuss them with Grace, and it's decided that we are just not going to tell anybody. CNA is not happy about it, let's say. Isn't that a different liability than the liability for Grace itself having... Being the source of asbestos, and CNA covering the damage from that? I know you want a different answer, but my answer is it's not. Just like Grace is protected under that situation. I expect you to say that, but why? The reason is just as Grace is protected by... Protected from intentional tort claims, conspiracy claims, any kind of claims you want to make against Grace. No one disagrees they're totally protected. What we're doing is part of... Let's assume there were a conspiracy claim. Are you saying even there, CNA is protected? Right, because that's part of the settlement with the trust that we made. Yes, that's correct. And we're protected from those claims. Now, there's no facts like that here, and there's no facts... If you look at their complaint, they're just saying we didn't step in and protect them, basically. That's what their complaint says, and that's what we're basing this on. But I understand where you're going. All right, thank you. Thank you. Thank you. Thank you. Let's take a step back and look at the statutory scheme and the legitimate interests that every asbestos debtor has, and that is to be able to reorganize utilizing insurance policy proceeds. A bankruptcy estate has no legitimate interest in taking claims that belong to a third party, in this case the Montana plaintiffs, and taking the proceeds of those claims, which the debtor by definition will settle on the cheap, because the debtor can only get money from a claim owing to somebody else by settling and not by litigating, and so the debtor will settle on the cheap, will drop those proceeds into the bucket for hundreds of thousands of asbestos claimants, thereby depriving those who are actually injured by the third party from having any legal redress. That is the statutory scheme that CNA is offering up to you, and it's not the way the bankruptcy code does or should work. We don't have laws in this country that deprive people of those kinds of rights, unless it is absolutely essential to the debtor's ability to proceed with its reorganization, and in this case, not essential at all, because CNA is one of the small minority of insurers that is accused of misconduct. It's a rare occurrence in this world, even though they have said in their brief and they are high on the rhetoric of, oh, this is a road map for anybody to pursue insurers and get around the limitations of the bankruptcy code. In fact, they offer no evidence that that has happened, will happen, or could happen. The Louis situation is unique. You have a situation where people are not damaged by the debtor's products, but rather by the way a particular race operation was run. Why is that unique? Isn't that just maybe the state of the science now? We're just now getting to the point where we're aware of this danger of contagion? No, you're wrong. The reason it's unique is because, and we cite the RAND study for this in our brief, the vast majority, almost all of the claims in Asbestos Chapter 11 cases are products claims, meaning that they come from exposure to racist products. This is a rare type of claim because in this case, there was an actual race operation where people were injured because proper industrial hygiene wasn't followed and also because the workers weren't warranted, so they were helpless to defend themselves against the danger that they were exposed to. But that's a different claim from the vast majority, as I say, of asbestos claims. So given that there's no statutory purpose that is required to protect CNA from claims for its own long doing, there is no reason to construe the Bankruptcy Code in that direction, even if you could do so, and I would respectfully suggest that Mr. Gennato is incorrect when he says that it's all a matter of 524 G1 and G2. 524 G1 and G2, as this Court held in the appeal from the Grace Confirmation, does indeed protect the debtor from all asbestos claims. Section 524 G4 starts off by saying an injunction under 524 G1. In other words, the starting point for 524 G4 is the injunction that protects the debtor from all claims. But then, Section 524 G4 imposes a narrower gate by using the language that the third party that they claim to be within the scope of the injunction would have to be for the conduct of or claims against Grace. That's a narrower window. There's no reason to use that language at all if what the statute was intended to do was to protect third parties from all asbestos claims that are stated under G1. Then the statute would simply have said any injunction under G1 can also protect a third party. And of course, it would go on to say by reason of provision of insurance. How is Pittsburg Courting any different from this case? In Pittsburg Courting, I think Judge Fitzgerald perhaps painted with too broad a brush. She identified what she called conspiracy claims and then defined them in such a way as to be quite broad in their application. We are not, by the way, asserting that we would have the right to plead conspiracy. We understand that arguably that would make the conspirator indirectly liable for Grace's conduct. We are saying the conduct has to be that of CNA. So as I say, Judge Fitzgerald, when you read Pittsburg Courting, she sleeps up a whole bunch of theories in that context of conspiracy theories. And it does not appear that she needed to do that in order to reach the result that she did in Pittsburg Courting. Are you arguing that the conduct has to be that of CNA independent of the contractual relationship? Well, it has to be conduct that created a duty under Montana law. Independent of? Independent of as a legal element. When we cite in our second letter brief, we cite the Montana cases that arise, for example, in the contractor, in the building trades cases where you have prime contractor, a subcontractor, and another subcontractor. No review contract between the two subcontractors. And in that situation, if this guy is negligent and it injures this guy, then there is liability under Montana law. And the Montana Supreme Court has said, yes, it's true that the only reason any of them are there is because of the prime contract. But describe that as an incidental fact. It's an incidental fact, not a legal element, not necessary to establish the liability. The liability comes from a reasonable expectation that this contractor should have had, that this other subcontractor was going to rely on his provision of services. And we have a statement here, Your Honor, that these were industrial hygiene services provided by doctors, by industrial hygienists, and when CNA sent those people on site to do a particular job, it was reasonably foreseeable that if they did that job badly, then others would be injured, the others being workers and certainly their spouses and family members. And how does that dovetail with the case where the one subcontractor is able to sue the third-party other subcontractor? I'm sorry? In your second submission to us, there is a Montana case in which you have a contractor, subcontractor, and another subcontractor, right? Yes, we sent two of them. And the one subcontractor apparently did something that injures the second subcontractor, correct? Yes, Your Honor. And that allows, under Montana law, a third-party claim to be made by the injured subcontractor, correct? Exactly, and that's a claim for negligence, Your Honor. It's not a contract claim, and as the court said, the contract is simply an incidental fact. It's background, Your Honor. Okay, so what is the duty here for CNA, even if it does go on to the property of living? Like any professionals, a lawyer, an accountant, we cite an accountant liability case. A farm food safety inspector, we cite a case for that also. When a professional undertakes services, he has a duty to all those who foreseeably could be harmed if he performs the services badly or negatively. It sounds like, especially in the subcontractor context, typically Paul's graph, foreseeable plaintiff contracts, and someone's within this zone of danger, foreseeably within it. And certainly, if you're an industrial hygienist, if you're a doctor, you're familiar with, and we allege this in our complaint, we say CNA was well aware of the hazards of asbestos exposure. CNA undertook to provide industrial hygiene services. They sent doctors and industrial hygienists. Those people have a professional, those people are familiar with the dangers of asbestos. When they walk through there, they see workers going around without adequate masks. They see dust thick in the air. They go outside, and they see that it's blanketing the town of Libby. The dust, Your Honor, covered the railroad yard so that when a train went barreling through at 60 miles an hour, just dust would just balloon up, and anybody walking by would breathe that dust and would be exposed to the potential for asbestos disease. That's how bad it was. An industrial hygienist or a doctor takes a look at that, and it's not foreseeable that people will be injured. I think it is foreseeable, Your Honor. And in either case, that's a decision from the Montana courts. Provided that there is some type of law in Montana, either a statute or a court decision, that says that in something analogous to this type of situation, you can have a liability. Well, Your Honor, as Manville, the court in Manville noted that the claims there… Yeah, but that was a dictum in Manville, was it not? Hold on, another reason. But, I mean, wasn't the statement in Manville a dictum? Well, I'm sorry, what were you saying, Your Honor? That you were referring to that Manville says in this type of situation it's non-derivative or a situation similar to what Manville was asbestos, so… No, it was not a dictum, Your Honor, and when the case went back down in Manville 4, the court reiterated its determination. It was the same panel minus Judge Sotomayor, who in the meantime had gone to the Supreme Court, but they were emphatic that liability was limited to insurance policy-related liability. They didn't make the distinction that Mr. Gianotto tried to about… I thought the statement in Manville 3 was that 524… You cited that a proposition to 524G does not permit a channeling injunction to bar actions against insurer for its own misconduct. Oh, I'm sorry, Your Honor, that statement is dictum. Okay. Sorry, I thought you were talking about the holding. But may I make one last comment on insurer? Sure. So, in Manville 3, the court noted that the types of claims asserted there actually had never been approved by any particular state. They would have been new types of claims, a new type of recognized cause of action in state court, and yet the proper division of responsibility between the state and federal courts required the Second Circuit to say, okay, you have to stay within the pleading limits that we're permitting here. It can't be to go after the insurance policies. But if you stay within those limits, you are allowed to bring those cases in state court, have your day in court, and the state court will decide. And we respectfully submit that the same thing ought to be done here, that we ought to leave it to the Montana courts to decide whether we can plead claims that establish the duties that we've been discussing here this afternoon. Thank you, Mr. Connolly. This is a transcript of the argument. And if you can check with Ms. Svoboski, did I get that? I missed your last vowel in your name. I didn't get that in there. Yeah, yeah, correct. And she can tell us how you go about getting a transcript to us. It's a puzzle, Mr. Connolly. And when you get a transcript of the argument. Transcript, you just split the cost. Oh, sure, yes. Just check up with the court's office. Yes, yes, yes. Yeah, you just split the cost. I didn't realize I was undertaking a liability here. It arises out of the argument. Thank you, Your Honor. That does make a good point. It's because you've done good, as they say in South Carolina. All right, well, thank you very much. Take the matter under advisement.